IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| BRIAN WRIGHT, | ) | Civil Action No. 2:10-2427-RMG-BM |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | **REPORT AND RECOMMENDATION** |
| STARK TRUSS CO., INC., | ) |  |
|  | ) |  |
| Defendant. | ) |  |
| _____ | ) |  |

This action has been filed by the Plaintiff pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et. seq., and the Family Medical Leave Act (FMLA), 15 U.S.C. § 1681b, against his former employer. The Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on January 9, 2012. After receiving an extension of time to respond, Plaintiff filed a memorandum in opposition on February 10, 2012, following which the Defendant filed a reply memorandum on February 21, 2012.

Defendant's motion is now before the Court for disposition.[1]

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The Defendant has filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

1



## **Background and Evidence**[2]

Plaintiff began his employment in1995 with the Defendant's predecessor, Carolina Truss[3], and worked in various capacities over the years including running a floor crew, working the roof line, as a forklift operator, and ultimately as shipping supervisor/dispatcher.[4]  See Plaintiff's Deposition, pp. 22-23; see also Bryant Deposition, pp. 27-28.  Plaintiff's wife, Stephanie, also worked for the Defendant as a receptionist/administrative assistant.  See Bryant Deposition, pp. 28-29, 35; see also Stephanie Wright Deposition, p. 21.  From 2001 until June 29, 2009, Plaintiff held the job of shipping supervisor/dispatcher and his responsibilities included contacting customers, setting up delivery dates, calling customers back to reconfirm the delivery dates a few days before the delivery date, making schedules for the drivers, and supervising the employees "in the yard" on what needed to be done and what needed to be ready.  See Plaintiff's Deposition, pp. 21, 23; see also Bryant Deposition, pp. 26, 30.  By June 2008, Plaintiff supervised approximately seven (7) employees and had an annual salary of $55,000.  See Plaintiff's Deposition, pp. 24, 31; see also Bryant Deposition, p. 91.

Plaintiff's supervisor was John Bryant, who started working for the Defendant in Ohio in November 1994.  See Plaintiff's Deposition, pp. 31-32; see also Bryant Deposition, pp. 10, 28.  Bryant worked in various locations in different capacities for the Defendant over the years prior to

---

[2]The facts and evidence are considered and discussed in this Report and Recommendation in the light most favorable to the Plaintiff, the party opposing summary judgment.  Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

[3]The Defendant purchased Carolina Truss in 2002.  See Plaintiff's Deposition, p. 21.

[4]Plaintiff briefly left the Defendant's predecessor and worked for Razor Component System as a forklift operator, but he then returned to Carolina Truss.  See Plaintiff's Deposition, p. 22.



coming to Summerville, South Carolina in December 2007 as the plant manager in a lateral move, which is when he began supervising the Plaintiff. See Bryant Deposition, pp. 13-14, 28; Plaintiff's Deposition, pp. 31-32. Bryant's boss was Todd Pollatta, who was a general manager, and Pollatta was in turn supervised by Steve Yodor, the Defendant's President, both of these individuals being located in Ohio. See Bryant Deposition, pp. 14-16. The Defendant did not have any human resources personnel in the Summerville location, although Angela Young served as the office manager.[5] Bryant testified that he had the power to hire, discipline, and terminate employees. See Bryant Deposition, p. 19.

When Bryant arrived in 2007, there were approximately 80 employees at the Summerville location. See Bryant Deposition, p. 25. Thereafter, the number of employees dropped to approximately 40 in 2009 and to around 30 in 2010. See Bryant Deposition, p. 26. The reduced number of employees in 2009 and 2010 also included some employees from the Greenville plant who were transferred to Summerville when that plant closed, apparently in late 2008. See Bryant Deposition, p. 24. Plaintiff's wife testified that the reduction in employees was due to the poor economy. See Stephanie Wright Deposition, p. 19. However, Plaintiff testified that because the Defendant had to let other employees go and Plaintiff assumed some of their responsibilities, his work load actually increased in 2009. See Plaintiff's Deposition, p. 37. Plaintiff further testified that, prior to losing his position in 2009, he was never worried about his job security or being laid off. See Plaintiff's Deposition, p. 39.

Plaintiff testified that Bryant became frustrated with him when he had to miss work

---

[5]Although Young provided guidance to co-workers at times, she testified that she did not supervise anyone and was not a manager in that sense, and did not have the authority to hire, discipline, or fire employees. See Young Deposition, pp. 9, 15, 18.



because his son was sick and hospitalized with pneumonia.  See Plaintiff's Deposition, pp. 33-34.

Bryant was also upset with Plaintiff's wife when she couldn't come back to work because her son was having tests done and was ultimately admitted to the hospital.  See Stephanie Wright Deposition, p. 28.  Plaintiff testified that he then started having his own health problems in March/April 2009.  See Plaintiff's Deposition, pp. 48-49; See also Bryant Deposition, p. 45; Stephanie Wright Deposition, p. 29.  Plaintiff testified that he was constantly sick, not sleeping, and losing weight, and that he was seen by physicians between eight (8) and nine (9) times for these problems.  See Plaintiff's Deposition, pp. 49, 51-52, 81; see also Stephanie Wright Deposition, pp. 29, 54, 64.  The doctors were not sure what was wrong with the Plaintiff so they were continually running tests and Plaintiff had to miss work for these appointments, causing Bryant to again become frustrated with him.  See Plaintiff's Deposition, p. 34.  Plaintiff talked to Bryant about these issues and having to go to doctor's appointments probably four or five times.  See Plaintiff's Deposition, p. 34-35; see also Bryant Deposition, pp. 44-45.  However, Young testified that, although she was aware that Plaintiff was having problems with his stomach, had lost weight, and had some doctor appointments in 2009, she never saw Plaintiff where he appeared ill and testified that his work performance was always "on fire."  See Young Deposition, pp. 25-26.

Plaintiff testified that he developed depression and anxiety probably starting in May 2009, although Bryant testified that he was not aware that Plaintiff suffered from depression during this time period.  See Plaintiff's Deposition, p. 51; see also Stephanie Wright Deposition, p. 32; Bryant Deposition, p. 42.  Plaintiff then had a nervous breakdown on June 20, 2009, during which he threatened to commit suicide.  See Plaintiff's Deposition, p. 59; see also Stephanie Wright Deposition, p. 35.  Plaintiff testified that the police came to his home, but that he was not arrested.

4



Rather, EMS took him to Trident Medical Center where he saw a counselor, who involuntarily committed him to a behavioral health clinic for a 72 hour evaluation. <u>See</u> <u>Plaintiff's Deposition</u>, pp. 56-57, 59, 63-64. Plaintiff was subsequently released from the facility with no restrictions. <u>See</u> <u>Plaintiff's Deposition</u>, p. 61; <u>see also</u> <u>Stephanie Wright Deposition</u>, pp. 35, 47.

In the interim, however, Plaintiff's wife called Young on Sunday and told her that Plaintiff had threatened suicide and was in the hospital. <u>See</u> <u>Stephanie Wright Deposition</u>, pp. 35-36. Plaintiff's wife told Young that the doctors thought Plaintiff was suffering from anxiety and depression. <u>See</u> <u>Stephanie Wright Deposition</u>, p. 36. Plaintiff's wife testified that Young told her not to tell Bryant why Plaintiff was in the hospital or he [Bryant] would fire him. <u>See</u> <u>Stephanie Wright Deposition</u>, p. 36. Plaintiff's wife also contends that Young told her that Plaintiff would be covered under the FMLA. <u>See</u> <u>Stephanie Wright Deposition</u>, pp. 35-36. However, Young also testified that Plaintiff's wife had also told her that Plaintiff had held a gun to her head before putting it to his own head, and that he had been taken away by the police. <u>See</u> <u>Young Deposition</u>, pp. 29, 31.

Plaintiff's wife also called Bryant on Sunday to tell him that Plaintiff was in the hospital, that he would not be at work on Monday, and that she would let him know more on Monday. <u>See</u> <u>Bryant Deposition</u>, p. 49; <u>see also</u> <u>Stephanie Wright Deposition</u>, p. 39. Bryant testified that he then met with Young and Plaintiff's wife on Monday in his office. <u>See</u> <u>Bryant Deposition</u>, p. 51; <u>see</u> <u>also</u> <u>Young Deposition</u>, pp. 42-43. Plaintiff's wife testified that she told Bryant that Plaintiff had threatened to kill himself and was in the hospital. <u>See</u> <u>Angela Wright's Deposition</u>, p. 40. However, Bryant testified that Plaintiff's wife told him that Plaintiff had threatened her as well as threatened suicide. <u>See</u> <u>Bryant Deposition</u>, pp. 51-52; <u>see</u> <u>also</u> <u>Young Deposition</u>, p. 42. Young testified that Plaintiff's wife said that the Plaintiff had a "meltdown". <u>See</u> <u>Young Deposition</u>,



pp. 45-46.  Bryant also testified that Plaintiff's wife told him that Plaintiff was in jail and wasn't sure when he was coming home.  See Bryant Deposition, pp. 53-55.

Bryant told Plaintiff's wife that she needed to go home and be with her family, and testified that he had no intention at that point of laying off the Plaintiff.  See Bryant Deposition, pp. 58, 64; see also Young Deposition, p. 47.  Young testified that Bryant told Plaintiff's wife that everything would be okay; see Young Deposition, p. 47; and Plaintiff's wife testified that Bryant told her to take the week off, to tell Plaintiff that he didn't have to worry about his job, and to just concentrate on getting better.  See Stephanie Wright Deposition, p. 41.  Bryant testified that even though Plaintiff's wife said she would be back in the morning, he told her "You be back when you can be back.  If you can be back tomorrow morning, that's great.  Just keep us posted so that I know what's going on."  See Bryant Deposition, p. 58.  However, Bryant testified that "She didn't do that." Id.  Young testified that she also called Plaintiff's wife five or six times, but never spoke with her, and that Plaintiff's wife did not return her phone calls.  See Young Deposition, pp. 52-53.

Bryant testified that Plaintiff finally called him on Friday and told him that he would be back at work on Monday.  See Bryant Deposition, p. 65.  Bryant asked Plaintiff if he had to go back to jail and what the situation was with jail time, and Plaintiff told him there were no charges pending and he was "good to go."  See Bryant Deposition, pp. 66-68, 70.  Bryant then called Mike Dyer, the Defendant's human resource risk manager (Bryant testified that he had also called Dyer earlier in the week after finding out about the situation with the Plaintiff).  See Bryant Deposition, pp. 71-73.  However, Bryant could not remember what Dyer had said after he relayed the information to him about his phone call with the Plaintiff.  See Bryant Deposition, p. 73.

Bryant testified that after he found out that Plaintiff had threatened suicide and been



hospitalized, he thought Plaintiff was unstable and believed that Plaintiff could have posed a potential threat to the workplace. See Bryant Deposition, pp. 92-93. Plaintiff testified that when he returned to work on June 29, 2009, he met with Bryant and Bryant told him that he had to think about it all weekend and it was not his decision, but that he had to let the Plaintiff go. See Plaintiff's Deposition, pp. 43, 66-67, 75; see also Stephanie Wright Deposition, p. 2; see also Bryant Deposition, p. 76. However, Bryant testified that he told Plaintiff that it was his decision. See Bryant Deposition, p. 75. Bryant testified that every position that was not absolutely necessary was being downsized or eliminated, and that while Plaintiff was gone they figured out that the position of dispatcher was not necessary. See Bryant Deposition, p. 74. Additionally, after Plaintiff left Bryant's office, Bryant called him back in and told him they also were terminating his wife. See Plaintiff's Deposition, p. 44; see also Bryant Deposition, p. 77; Stephanie Wright Deposition, p. 24. Bryant did tell Plaintiff that he could check and see if he could keep him on as a yard guy with a pay cut. See Plaintiff's Deposition, pp. 43-44; see also Bryant Deposition, p. 78 [Bryant testified that it was a definite offer and that Plaintiff was still sitting down in his office when he made this offer]; see also Stephanie Wright Deposition, p. 26. However, Plaintiff did not feel like this was a sincere job offer, because it was made after Bryant had already told him that he had to let him go and after Plaintiff had initially left Bryant's office. See Plaintiff's Deposition, pp. 45-47. Young testified that after telling Plaintiff he had lost his position, Bryant told Plaintiff's wife that he was having to let her go and that he had also had to let the Plaintiff go. See Young Deposition, p. 72.

Bryant testified that during the time Plaintiff was out his duties were covered by other employees, including Bryant, who continued to perform these duties after Plaintiff left, and that they did not replace Plaintiff after he was terminated. See Bryant Deposition, pp. 81-83; see also Young



Deposition, p. 67.  Further, no one received any pay increases or bonuses as a result of handling these additional duties.  See Bryant Deposition, p. 84.  Bryant wrote Plaintiff a letter of reference in which he stated that Plaintiff was a good employee in good standing with the Defendant, took pride in his work, and always worked hard to satisfy customers.  See Plaintiff's Deposition, p. 117.  Bryant also strongly recommended the Plaintiff, stating that he was hard working, diligent, and capable.  See Plaintiff's Deposition, p. 118.  Bryant also testified that Plaintiff was an above average worker and was performing his job satisfactorily when he left.  See Bryant Deposition, p. 31.  Young also testified that Bryant was a good employee.  See Young Deposition, p. 22.  Plaintiff currently works as a supervisor at East Coast Molding Distributors, where he supervises approximately twenty (20) employees and makes an annual salary of $36,000 (Plaintiff was originally hired as a picker at a rate of $10/hour and received his promotion and an increase to his current salary in January 2010).  See Plaintiff's Deposition, pp. 28-29.

Plaintiff testified that he went to counseling twice a week until August 2009.  See Plaintiff's Deposition, pp. 63-64.  Plaintiff also took medication for his depression and anxiety from June 2009 until he got his depression and anxiety under control in March/April 2010.  See Plaintiff's Deposition, pp. 56-57; cf Stephanie Wright Deposition, p. 51 [indicating it was around February/March 2010].  On or about October 8, 2009, Plaintiff filed an administrative charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that the Defendant had discriminated against him in violation of the ADA.  After receiving a Right to Sue letter, Plaintiff filed this Complaint asserting causes of action for wrongful discharge in violation of the ADA and FMLA.



## **Discussion**

Defendant seeks summary judgment on both of Plaintiff's causes of action. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).

### **I.**

### **(ADA Claim)**

Plaintiff's ADA wrongful discharge claim is for disparate treatment, based on his claim that he was discriminated against on the basis of a disability when he was terminated by the Defendant. Disparate treatment claims under the ADA are evaluated under the same standards as discrimination claims asserted under Title VII of the Civil Rights Act of 1964. Cunningham v. Enterprise Rent-A-Car Co., No. 07-1615, 2010 WL 724507 at * 4 (W.D.Pa. Mar. 1, 2010)[The same standards govern disparate treatment claims arising under either Title VII or the ADA.]; Loveless v. Sherwin-Williams Co., 681 F.2d 230, 238 (4th Cir. 1982). Such claims require proof of intentional discrimination, either by direct evidence or by the structured procedures set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Plaintiff contends that he has direct evidence of discrimination because Plaintiff's wife testified that Wright told her not to tell Bryant why the

9



Plaintiff was in the hospital or he would fire him.  See Stephanie Wright Deposition, p. 36.  However, this conclusory statement by a non-decision maker about what a third party might think or do if told a certain fact is not direct evidence of discrimination.[6]  Therefore, the undersigned has evaluated Plaintiff's claim under the McDonnell Douglas proof scheme.

The United States Supreme Court articulated a three-part formula for analyzing discrimination cases in McDonnell Douglas.  First, Plaintiff must establish a prima facie case of discrimination.  If a prima facie case is established, a rebuttable presumption is created that the Defendant unlawfully discriminated against him.  Second, once this presumption has been established, the burden of production shifts to the Defendant to show a legitimate, non-discriminatory reason for its actions.  Third, if the Defendant shows a legitimate, non-discriminatory reason for its actions, the burden is then on the Plaintiff to come forward with evidence that the Defendant's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that the actions of the Defendant were really based on Plaintiff's disability.  McDonnell Douglas Corp., 411 U.S. at 802-805; Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-256 (1981); Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 234-235 (4th Cir. 1991). Despite these shifting burdens of production, however, Plaintiff retains the ultimate burden of persuasion on the issue of discrimination throughout.  Texas Dep't of Community Affairs, 450 U.S. at 252-253; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

_____

[6]Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions. O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 548-549 (4th Cir. 1995), rev'd on other grounds, 517 U.S. 308 (1996);  Black's Law Dictionary, 460 (6th Ed. 1990) (citing State v. McClure, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974); see Williams v. General Motors Corp, 656 F.2d 120, 130 (5th Cir. 1981), cert. denied, 455 U.S. 943 (1982).



**Prima facie case**. In order to meet the first prong of the <u>McDonnell Douglas</u> formula and establish his prima facie case of wrongful discharge in violation of the ADA, Plaintiff must by a preponderance of the evidence show four criteria: first, he must be a qualified person with a disability[7]; second, he must have been discharged; third, he must have been fulfilling his employer's legitimate expectations at the time of discharge; and fourth, the circumstances of his discharge must raise a reasonable inference of unlawful discrimination. <u>Rohan v. Networks Presentations, LLC</u>, 375 F.3d 266, 272 n. 9 (4th Cir. 2004); <u>Haulbrook v. Michelin N. Am., Inc.</u>, 252 F.3d 696, 702 (4th Cir. 2001); <u>Taylor v. Ameristeel Corp.</u>, 155 Fed.Appx. 85, 89 (4th Cir. Nov. 18, 2005); <u>Haneke v. Mid-Atlantic Capital Management</u>, 131 Fed.Appx. 399, 400 (4th Cir. May 10, 2005); <u>see also</u> <u>Anderson v. Roche Carolina, Inc.</u>, No. 10-2792, 2012 WL 368710, at * 6 (D.S.C. Feb. 3, 2012).[8]

Defendant initially argues that Plaintiff cannot show that he even has a "disability" within the meaning of the ADA, entitling the Defendant to dismissal of this claim. The term "disability" is defined as a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual, b) a record of such impairment, or c) being regarded as having such an impairment. 42 U.S.C. § 12102(1); <u>Pollard</u>, 281 F.3d at 467.[9] A "major life activity"

---

[7]A "qualified person with a disability " is someone who, with or without a reasonable accommodation, can perform the essential functions of the position in question. <u>See</u> 42 U.S.C. A. § 12111(8); <u>Tyndall v. National Education Centers, Inc. of California</u>, 31 F.3d 209, 213 (4th Cir. 1994).

[8]The Defendant must also be subject to suit under the ADA. 42 U.S.C. § § 12111(2)(5), 12112(a). Defendant does not contest that it is subject to suit under the ADA.

[9]It must be noted that Congress made substantial changes to the ADA through the ADA Amendments Act of 2008 ("ADAAA"), which has an effective date of January 1, 2009. "The ADAAA was intended to clarify congressional intent with respect to the original ADA, as well as to overturn certain United States Supreme Court cases that had narrowed the ADA's scope;" <u>Ryan v.</u>

(continued...)



is defined as a basic activity that an average person can perform with little or no difficulty, such as walking, hearing, speaking, learning, breathing, standing, lifting, seeing and working. Appendix to 29 C.F.R. § 1630.2(I); see Bruncko v. Mercy Hosp., 260 F.3d 939, 941 (8th Cir. 2001); Dutcher v. Ingalls Shipbuilding, 53 F.3d 723-727, n. 7 (5th Cir. 1995); Gupton v. Virginia, 14 F.3d 203, 205 (4th Cir. 1994), cert. denied, 513 U.S. 810 (1994) ( Rehabilitation Act).[10] Major life activities also include caring for oneself, eating, concentrating, thinking, and sleeping. See 42 U.S.C. § 12102(2)(A).

Plaintiff alleges that he suffered from anxiety and depression, that he thought about committing suicide three or four times and that he eventually attempted suicide which led to a four-day hospitalization, and that his condition limited his major life activities of sleeping, eating, thinking, and concentrating. Considered in the light most favorable to the Plaintiff, the evidence reflects that Plaintiff started having health problems in March/April 2009; see Plaintiff's Deposition, pp. 48-49; See also Bryant Deposition, p. 10, 45; see also Stephanie Wright Deposition, p. 29; and that he had seen doctors between eight (8) and nine (9) times for these problems prior to June 20, 2009. See Plaintiff's Deposition, p. 49. Plaintiff testified that he was constantly sick, had nausea, was vomiting,

---

[9](...continued)
Columbus Regional Healthcare System, Inc., No. 10-234, 2012 WL 1230234 at * 3 (E.D.N.C. Apr. 12, 2012); and under the ADAAA, "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals . . . , to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). Further, "[t]he primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1 (2011). Since Plaintiff lost his job on June 29, 2009, these amendments apply to his ADA claim. Therefore, the undersigned has considered Plaintiff's claim pursuant to this new enhanced standard.

[10]See Hooven-Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir. 2001) [same standards apply to ADA and Rehabilitation Act]; Smaw v. Commonwealth of Virginia Department of State Police, 862 F.Supp. 1469, 1474 (E.D.Va. 1994) [same].



not sleeping, and losing weight; see Plaintiff's Deposition, pp. 34, 51-52, 81; see also Stephanie Wright Deposition, p. 29; and Plaintiff's wife testified that his anxiety and depression affected his sleep and eating. See Stephanie Wright Deposition, pp. 54, 64. Young also testified that she was aware that Plaintiff was having problems with his stomach, had lost weight, and had some doctor appointments in 2009. See Young Deposition, pp. 25-26. Plaintiff testified that he developed depression and anxiety probably starting in May 2009; see Plaintiff's Deposition, p. 51; see also Stephanie Wright Deposition, p. 32; and that he had a nervous breakdown on June 20, 2009, when he threatened to commit suicide which was the result of a downward spiral from his depression over the previous months. See Plaintiff's Deposition, p. 59; see also Stephanie Wright Deposition, p. 35. This resulted in Plaintiff being involuntarily committed to a behavioral health clinic, where he was sent for a 72 hour evaluation. See Plaintiff's Deposition, pp. 56-57, 59. Even after he was released, Plaintiff went to counseling twice a week until August 2009; see Plaintiff's Deposition, pp. 63-64; and took medication for his depression and anxiety from June 2009 until he got his depression and anxiety under control in March/April 2010. See Plaintiff's Deposition, pp. 56-57; cf Stephanie Wright Deposition, p. 51 [indicating it was around February/March 2010].

Plaintiff argues that this evidence shows his condition met the definition of a disability because his major life activities of sleeping, eating, thinking, and concentrating were all substantially limited by his mental impairment. Plaintiff also argues that this evidence reflects that he had a record of such an impairment. The undersigned agrees. The EEOC regulations implementing the ADA define a mental impairment to include mental or psychological disorders, such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities. See 29 C.F.R. § 1630.2(h)(2). Further, depression can constitute a disability under ADA. Cassing v.



Board of Educ. of Rockford Public Schools, 461 F.3d 932, 936 (7th Cir. 2006); Battle v. United Parcel Service, Inc., 438 F.3d 856, 861 (8th Cir. 2006)[Mental impairments, including anxiety and depression, are ADA-qualifying disabilities if they affect the Plaintiff's thinking and concentration].

The Defendant argues that Plaintiff has not shown that he has a disability, and that in any event the impairments which he alleges were at most temporary. However, an impairment that is even episodic or in remission is a disability if it would substantially limit a major life activity when active. See 29 C.F.R. § 1630.2(j)(vii); see also 42 U.S.C.§ 12102(4)(D). Further, although there is no evidence as to whether Plaintiff was diagnosed with major depression, there is evidence that Plaintiff contemplated suicide on three or four occasions, saw doctors eight or nine times because he could not sleep or was losing weight, attempted suicide on one occasion, was involuntarily hospitalized for four days, attended counseling for a couple of months afterward and took medication for approximately nine months after his suicide attempt to get his depression under control. Viewed in the light most favorable to the Plaintiff, this evidence is sufficient to establish a genuine issue of fact as to whether Plaintiff suffered from a "disability" under the ADA during the relevant time period. Therefore, the Defendant is not entitled to summary judgment on this ground.[11]

---

[11]Plaintiff can also show that he has a disability by showing that the Defendant "regarded" him as having an impairment. See 42 U.S.C. § 12102(3); Wilson v. Phoenix Specialty Mfg. Co., Inc., 513 F.3d 378, 384-385 (4th Cir. 2008); MacDonald v. Delta Airlines, Inc., 94 F.3d 1437, 1443 (10th Cir. 1996).

> Prior to Congress' passage of the ADA Amendment Act of 2008, Pub. L. No. 110–325, § 2(b)(1)-(6), 122 Stat. 3553 (2008) ("ADAAA"), there were two ways in which a person could be regarded as being disabled: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). However, with the passage of the ADAAA, which became effective January 1, 2009

(continued...)



With regard to the second prong of the prima facie case, Defendant argues that Plaintiff cannot show that he was discharged because it offered him a transfer to another position. However, Defendant faces two hurdles with respect to this argument. First, Plaintiff testified that Defendant never mentioned the second position before Bryant discharged him. Rather, Bryant called him back in and told him that they were also terminating his wife. See Plaintiff's Deposition, p. 44; Bryant Deposition, p, 77; Stephanie Wright Deposition, p. 24. Then, as Plaintiff was leaving, Bryant told him that he could check and see *if* he could keep Plaintiff on as a yard guy with a pay cut. See Plaintiff's Deposition, pp. 43-44; Stephanie Wright Deposition, p. 26. Plaintiff did not believe that it was a sincere job offer. See Plaintiff's Deposition, pp. 45-47. Young also testified that after telling Plaintiff that he had lost his job, Bryant also told Plaintiff's wife that he had to let the Plaintiff go.

---

[11](...continued)
and overruled Sutton,"[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §12102(3)(A).

Mohney v. Pennsylvania, 809 F.Supp.2d 384, 400 n. 14 (W.D.Pa. 2011).

Here, despite the Defendant's financial condition and recent cut-backs, Bryant testified that he had no intention of eliminating Plaintiff's position. Bryant Deposition, p. 64. Plaintiff also testified that there was no concern about his position being eliminated despite the Defendant's cut-backs. See Plaintiff's Deposition, p. 39. However, although Bryant testified that he had previously been unaware that Plaintiff was suffering from depression, after he found out about Plaintiff's attempted suicide, he thought Plaintiff was unstable; see Bryant Deposition, pp. 92-93; and within one week of Bryant finding out that Plaintiff had attempted suicide, Plaintiff's position was suddenly eliminated. See Bryant Deposition, p. 76; Plaintiff's Deposition, pp. 43, 66-67, 75; Stephanie Wright Deposition, p. 2. Considered in the light most favorable to the Plaintiff, this evidence is sufficient to create a genuine issue of fact with respect to the "regarded as" prong, even if Plaintiff had not otherwise established a disability under the other two prongs of the "disability" definition, because the evidence creates a question of fact as to whether Plaintiff's alleged impairment exceeded six (6) months in duration. 42 U.S.C. § 12102(3)(B); see Plaintiff's Deposition, pp. 48-51, 56-57, 59, 63-64.

15



See Young Deposition, p. 72. Furthermore, it is undisputed that the purportedly offered position at issue was a substantially less desirable job with a significant reduction in salary. See Bryant Deposition, p. 78. This evidence is sufficient to establish a genuine issue of fact as to whether Plaintiff was discharged to avoid summary judgment on the second prong of the prima facie case.

With regard to the third prong, the Defendant does not assert that Plaintiff was not meeting its expectations in performing the duties of his job at the time of his discharge. See Plaintiff's Deposition, pp. 117-118; Bryant Deposition, p. 31; Young Deposition, p. 22. To the contrary, Bryant testified that there were no problems with Plaintiff's job performance, and even wrote Plaintiff a letter of reference stating that Plaintiff was a good employee in good standing with the Defendant, took pride in his work, and always worked hard to satisfy customers. Bryant Deposition, pp. 31, 117. Rather than challenging Plaintiff's performance, the Defendant asserts instead that Plaintiff is not entitled to relief on his ADA claim since he was no longer qualified for his job because he was a direct threat. Under the applicable caselaw, an individual may be deemed unqualified if he poses a direct threat. 42 U.S.C. § 12111(3); see Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284, 1290-1291 (7th Cir. 2000).[12] Such a determination must be made based on an individualized assessment of the employee's present ability to safely perform the essential functions of the job.

As defined in the Code of Federal Regulations,

---

[12]There is some question, however, as to which party has the burden of proof on this issue. Wurzel v. Whirlpool Corp., No. 10-3629 (6th Cir. Apr. 27, 2012); Cf. EEOC v. Wal-Mart Stores, Inc., 477 F.3d 561, 571-572 (8th Cir. 2007)[employer must prove direct threat]; Brooks v. Micron Technology, Inc., No. 09-679, 2010 WL 1779693 at * 5, n. 5 (E.D.Va. Apr. 30, 2010)[employer must prove direct threat]; Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284, 1291-1294 (10th Cir. 2000)[describing cases on both sides]; but see LeChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998)[plaintiff must prove the absence of a direct threat].



16

Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;
(2) The nature and severity of the potential harm;
(3) The likelihood that the potential harm will occur; and
(4) The imminence of the potential harm.

29 C.F.R. § 1630.2(R).

Based upon the facts in this case, the undersigned does not find that this defense entitles the Defendant to dismissal of Plaintiff's ADA claim. First, the Defendant itself argues that Plaintiff was released without any restrictions on his ability to return to work. See Defendant's Memorandum in Support of Summary Judgment, p. 6. Further, the Defendant did not request that Plaintiff undergo any type of medical examination prior to discharging him, nor is there any evidence in the record to contradict that Plaintiff was released without restrictions or that any medical professional had determined he posed any type of threat. Additionally, the Defendant argues that it did not even terminate the Plaintiff, but instead offered him another position. Defendant has offered no rationale for why it would have perceived Plaintiff to be a direct threat in his former position thereby justifying his dismissal, but would not have so perceived the Plaintiff in a new position, where he would have continued working in the same facility with the same people. Hence, Defendant's contention that it offered another position to the Plaintiff in the "yard" undercuts its credibility on this defense, and Defendant is not entitled to summary judgment on the basis that it perceived Plaintiff



as a direct threat or that Plaintiff was a direct threat.[13]   Therefore, the undersigned finds the evidence sufficient to avoid summary judgment on the third prong of Plaintiff's prima facie case.

Defendant next asserts that Plaintiff cannot meet the fourth prong of the prima facie case because the circumstances of his discharge do not raise a reasonable inference of unlawful discrimination.  However, considered in the light most favorable to the Plaintiff, the evidence shows that Plaintiff's work load actually increased in 2009 because the Defendant had let other employees go and Plaintiff assumed their responsibilities; see Plaintiff's Deposition, p. 37; and Bryant testified that until Plaintiff missed work for a week due to his suicide attempt, he had no intention of laying Plaintiff off.  Bryant Deposition, p. 64.   However, following Plaintiff's hospitalization, Bryant expressed concern about Plaintiff's stability, while Young had warned Plaintiff's wife not to tell Bryant why Plaintiff was in the hospital or he [Bryant] would terminate Plaintiff's employment.  See Stephanie Wright Deposition, p. 36; Bryant Deposition, pp. 92-93.  Then, when Plaintiff returned to work one week after his attempted suicide, Bryant terminated Plaintiff's employment.  This evidence, considered in the light most favorable to the Plaintiff, is sufficient to create a genuine issue of fact as to whether Plaintiff was discharged because of his medical condition.  Therefore, Plaintiff has established his prima facie case of discrimination.

**Legitimate, non-discriminatory reason**.  With respect to whether the Defendant has met its burden of producing a legitimate, non-discriminatory reason for its actions, the Defendant has submitted evidence to show that, while Plaintiff was gone, they determined that the position of dispatcher was not absolutely necessary.  Bryant Deposition, p. 74.  It is also undisputed that the

---

[13]The undersigned also notes that this is not the reason why Defendant asserts it eliminated Plaintiff's position.



Defendant had gone through a series of reductions in the work force over the past few years and sought ways to reduce its expenses; <u>Bryant Deposition</u>, pp. 25-26; <u>Stephanie Wright Deposition</u>, p. 19; and Bryant testified that, after Plaintiff was discharged, he was not replaced. <u>Bryant Deposition</u>, pp. 81-83.

This evidence is sufficient to establish a legitimate, non-discriminatory reason for the Defendant's decision to terminate Plaintiff's employment. <u>See</u> <u>EEOC v. Clay Printing Co.</u>, 955 F.2d 936, 941 (4th Cir. 1991) [The Defendant's burden of establishing a legitimate, non-discriminatory reason is only one of production, not of persuasion]; <u>Texas Dep't of Community Affairs</u>, 450 U.S. at 256 [the burden of establishing a <u>prima facie</u> case is not onerous]. Therefore, Plaintiff must present evidence of pretext in the making of the decision to terminate him in order to avoid summary judgment on his wrongful discharge claim.

**Pretext**. In order to show pretext, Plaintiff must show that "but for" the Defendant's intent to discriminate against him because of his disability, he would not have been terminated. <u>EEOC</u>, 955 F.2d at 941; <u>Conkwright v. Westinghouse Elec. Corp.</u>, 933 F.2d 231, 234 (4th Cir. 1991). "Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole... must be sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by [discriminatory animus].'" <u>LeBlanc v. Great American Ins. Co</u>, 6 F.3d 836, 843 (1st Cir. 1993)(citing <u>Goldman v. First Nat'l Bank of Boston</u>, 985 F.2d 1113, 1117 (1st Cir. 1993)(quoting <u>Connell v. Bank of Boston</u>, 924 F.2d 1169, 1172, n. 3 (1st Cir. 1991); <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 141-143 (2000).

Plaintiff's pretext argument is that the Defendant had no intention, prior to his absence due to medical problems, of eliminating his position. Although Defendant argues that it was during



Plaintiff's absence that it discovered it could eliminate his position, Plaintiff testified that he missed three days in 2008 during the midst of cut-backs and layoffs, but before his suicide attempt, and the Defendant never made any attempt to eliminate his position. <u>Plaintiff's Deposition</u>, p. 33. Additionally, Bryant testified that, after Plaintiff's hospitalization, he believed Plaintiff was unstable and could pose a potential threat to the workplace, while Plaintiff's wife testified that Young told her not to tell Bryant why the Plaintiff was in the hospital or he would fire him. <u>See</u> <u>Bryant Deposition</u>, pp. 92-93; <u>Stephanie Wright Deposition</u>, p. 36. This evidence is sufficient to show pretext and to create a genuine issue of fact as to a discriminatory animus in Plaintiff's termination to avoid summary judgment. *Cf.* <u>Reeves</u>, 530 U.S. at 140-143 [setting forth the general proposition that where a plaintiff presents sufficient evidence to raise an inference that the employer's asserted justification for the employment decision is false, a trier of fact can conclude that the employer unlawfully discriminated.].

## II.

### (Failure to Accommodate)

Defendant also asserts that Plaintiff's ADA claim should be dismissed because it accommodated him by giving him one week off and then offered to transfer him to another position. In order to establish a prima facie case for failure to accommodate, Plaintiff must show: (1) he had a "disability"; (2) the Defendant had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of his position; and (4) the Defendant refused to make such accommodations. <u>Haneke</u>, 131 Fed.Appx. at 400. Plaintiff has shown that he has a disability. <u>See</u> discussion, <u>supra</u>. The evidence is also sufficient to create a question of fact as to whether the Defendant was aware of Plaintiff's disability. <u>Plaintiff's Deposition</u>, pp. 33-35, 49-49, 51-52, 81;



<u>Bryant Deposition</u>, pp. 44-45, 49, 51-55, 57-59, 67-68, 76-77, 92-93; <u>Young Deposition</u>, pp. 25-26, 29, 31, 45-46; <u>Stephanie Wright Deposition</u>, pp. 29, 35-36, 39.

As previously discussed, the Defendant itself argues that Plaintiff was released to return to work without restrictions, and Bryant wrote Plaintiff a glowing recommendation letter touting his abilities and work ethic. <u>See</u> discussion, <u>supra</u>. Therefore, the evidence reflects that Plaintiff could have returned to work and performed the essential functions of his job. In fact, this evidence reflects that Plaintiff did not even need an accommodation. In any event, the job Plaintiff was offered was not an accommodation for his disability, as there is no evidence to show that the offered position had different work requirements that would have allowed Plaintiff to work with his medical condition, while the position Plaintiff already held did not. This argument by the Defendant is therefore without merit.

### III.

### (FMLA Claim)

Plaintiff also contends that he was fired in retaliation for requesting and taking leave under the FMLA. The FMLA provides twelve (12) weeks of unpaid leave per year for eligible employees. An "eligible employee" under the Act is an employee who has been employed for at least twelve (12) months by the employer with respect to whom leave is requested, and for at least one thousand two hundred and fifty (1,250) hours of service with such employer during the previous twelve (12) month period. 29 U.S.C. § 2611(2)(A). Defendant does not dispute that Plaintiff meets this standard.

Under the FMLA, an employee is entitled to take reasonable leave for medical and other reasons in a manner that accommodates the legitimate interests of their employer. 29 U.S.C. §



2612.  In addition to providing substantive rights to unpaid leave, the FMLA also provides proscriptive rights "that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA." <u>Dotson v. Pfizer, Inc.</u>, 558 F.3d 284, 294 (4th Cir. 2009)(quoting <u>Yashenko v. Harrah's NC Casino Co.</u>, 446 F.3d 541, 546 (4th Cir. 2006).  In this case, Plaintiff contends that the Defendant discriminated against him for seeking and taking FMLA leave. <u>Id</u>. at 295 ["Courts have recognized that the FMLA provides a cause of action for retaliation."](citing <u>Blankenship v. Buchanan Gen. Hosp.</u>, 140 F.Supp.2d 668, 671-672 (W.D.Va. 2001)).  Defendant argues that no violation of the FMLA occurred when Plaintiff was terminated from his employment because 1) he did not request leave under the FMLA and, therefore, its provisions were not triggered; 2) there was nothing wrong with Plaintiff during the last few days of his absence and he just "laid around and watched television"; and 3) he was not entitled to protection under the FMLA because his position was eliminated. After careful review and consideration of the evidence before this Court, the undersigned does not find that the Defendant is entitled to summary judgment on any of these grounds.

With respect to Defendant's assertion that Plaintiff did not give proper notice of his intention to take leave under the FMLA and, therefore, did not trigger any protection under the FMLA, the Fourth Circuit has held,

> Regulations promulgated by the Department of Labor "repeatedly emphasize that it is the employer's responsibility to determine the applicability of the FMLA and to consider requested leave a FMLA leave." <u>Price v. City of Fort Wayne</u>, 117 F.3d 1022, 1026 *7th Cir. 1997)(citing 29 C.F.R. § 825.303(b)).

<u>Dotson</u>, 558 F.3d at 293.

> [U]nder the framework established by the FMLA and the accompanying regulations, to satisfy this initial burden, the employee need only inform [his] employer that [he]



22

needs leave from work for a medical reason. The employee must provide "verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave." 29 C.F.R. § 825.302. "The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed." 29 C.F.R. § 825.303(b). If the employee provides sufficient notice, the burden then shifts to the employer to gather additional information and determine if the FMLA is actually implicated. After the employee provides initial notification, "the employer will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303(b). The employer may seek the employee's cooperation in gathering information. If the employer finds the employee's request for leave vague or insufficient, the employer should ask the employee to provide the necessary details through additional documentation and information. 29 C.F.R. § 825.302(c). The employer has the duty to elicit the details required under the FMLA.

Krenzke v. Alexandria Motor Cars, Inc., 289 Fed. App. 629, 632 (4th Cir. 2008).

Further, "[t]he regulations implementing the FMLA provide that when an employee's need for FMLA leave is unforeseeable (as [Plaintiff's] was), 'notice may be given by the employee's spokesperson (e.g., spouse, adult family member, or other responsible party) if the employee is unable to do so personally.'" Millea v. Metro-North R. Co., 658 F.3d 154, 161 (2d Cir. 2011)(citing 29 C.F.R. § 825.303(a)). Therefore, Plaintiff's wife could provide the necessary notice that Plaintiff had a medical illness and needed medical leave because of the illness, and viewing the facts in the light most favorable to the Plaintiff, he satisfied his initial burden under the FMLA by his wife notifying both Bryant and Young of Plaintiff's threatened suicide attempt and hospitalization. See Bryant Deposition, pp. 49, 51-52, 92-93; Stephanie Wright Deposition, pp. 35-36, 39-40; Young Deposition, pp. 42-43, 45-46. Furthermore, Plaintiff's wife testified that Wright specifically told her that Plaintiff would be covered under the FMLA. See Stephanie Wright Deposition, pp. 35-36. Therefore, Defendant's argument that the provisions of the FMLA were never triggered is without merit.

Next, the Defendant argues that since nothing was wrong with Plaintiff during the last few days of his absence, he is not entitled to FMLA protection. However, again viewing the evidence



in the light most favorable to the Plaintiff, Plaintiff was suffering from a medical condition which necessitated an absence, at a minimum, for part of the week that Plaintiff missed. There is also no evidence that the Defendant requested Plaintiff to come in when he called on Friday, requested him to work the upcoming weekend[14], or to report back any earlier than Monday. Hence, even assuming arguendo for purposes of Plaintiff's FMLA claim that Plaintiff was not entitled to FMLA leave for the last few days of his absence from work, this fact does not prevent Plaintiff from being entitled to coverage during his initial absence.

It is also not necessary for this Court to resolve the question of the exact date Plaintiff's FMLA leave period expired, as there is no evidence Plaintiff's termination was due to his failure to return to work at the end of this period. Rather, the evidence reflects that Plaintiff's wife discussed Plaintiff's absence with the Defendant on Monday and was told to have Plaintiff take the week off, that Plaintiff didn't have to worry about his job, and that Plaintiff should just concentrate on getting better. See Stephanie Wright Deposition, p. 41. Further, Plaintiff himself called and talked to Bryant on Friday to tell him that he would be in on Monday; Bryant Deposition, p. 65; and the Defendant has offered no evidence to show that it requested Plaintiff to return to work sooner or that it sought any additional information or documentation from the Plaintiff to determine the scope of his medical condition or problems. The undersigned also notes that, not only did did Defendant never request that Plaintiff return to work sooner, but Bryant never told Plaintiff or anyone else that Plaintiff's absence for the additional days now cited by the Defendant in its brief played in part in its decision to eliminate Plaintiff's position. Rather, the Defendant argues the decision was made

---

[14]Plaintiff testified that he worked an *occasional* Sunday mornings and would *usually* work on Saturday until noon or one o'clock; Plaintiff's Deposition, p. 66; although it is not clear whether he would have been working this specific weekend regardless of his health situation.



because it had determined Plaintiff's position was no longer needed. <u>Bryant Deposition</u>, pp. 43-66-67, 75; <u>Stephanie Wright Deposition</u>, p. 2. Hence, while an employer may terminate an employee who fails to return to work after the expiration of the FMLA leave period; <u>see</u> <u>Wiggins v. Davita Tidewater, LLC</u>, 451 F.Supp.2d 789, 802-803 (E.D.Va. 2006); <u>Miller v. Personal-Touch of Va., Inc.</u>, 342 F.Supp.2d 499, 515 (E.D.Va. 2004); Defendant offers a wholly different reason for Plaintiff's termination: that upon his return his job had been eliminated due to the Defendant's downsizing. The undersigned also notes that Plaintiff's wife was also terminated when she returned despite her testimony that she had been told to take the week off. Nothing in the evidence reflects that Plaintiff's termination had anything to do with his not having returned to work earlier than he did. Therefore, this argument is without merit.

With respect to Defendant's final argument, the FMLA requires that an employer restore an employee to their former position of employment or an equivalent position when they return from FMLA leave. <u>See</u> 29 U.S.C. § 2614(a)(1)(A) and (B). However, the FMLA does not require that an employer provide a returning employee any right, benefit, or position of employment to which the employee would not have been entitled even if the employee had never taken leave. 29 U.S.C. § 2614(a)(3)(B). <u>See</u> 29 C.F.R. § 825.216(a) ["An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA."]. Plaintiff asserts that when he returned from his FMLA leave, instead of restoring him to his former position of employment or to an equivalent position, he was fired, while Defendant contends that Plaintiff's position was eliminated due to a natural downsizing of the company due to the bad economy, a decision allowed under FMLA. <u>See</u> <u>Vargas v. Globetrotters Eng. Corp.</u>, 4 F.Supp.2d 780, 783 (N.D.Ill. 1998)[Secretary had no right to



reinstatement to field secretary position because it had been eliminated before she returned from leave]; *cf.* <u>Ilhardt v. Sara Lee Corp.</u>, 118 F.3d 1151, 1157 (7th Cir. 1997)[Plaintiff not allowed to return from leave because her position was eliminated in a reduction-in-force]; <u>Patterson v. Alltel Information Services, Inc.</u>, 919 F.Supp. 500, 505, n. 10 (D.Maine 1996).

      Considered in the light most favorable to the Plaintiff, the evidence reflects that Plaintiff's work load actually increased in 2009 because the Defendant had let other employees go and Plaintiff had assumed their responsibilities. See <u>Plaintiff's Deposition</u>, p. 37. Prior to losing his position in 2009, Plaintiff was never worried about his job's security or being laid off; <u>see</u> <u>Plaintiff's Deposition</u>, p. 39, and both Plaintiff and his wife testified that Bryant expressed frustration when they had to miss work. <u>Plaintiff's Deposition</u>, pp. 33-35, 48-49; <u>Stephanie Wright Deposition</u>, p. 28; <u>Bryant Deposition</u>, pp. 44-45. Even Bryant testified that, until Plaintiff missed work due to his suicide attempt, he had no intention of laying Plaintiff off. <u>Bryant Deposition, p. 64</u>. However, one week after Plaintiff's attempted suicide when he returned to work, the Defendant terminated Plaintiff's employment. In addition to the very suspicious timing of these events, Plaintiff had been out for three days in 2008 in the midst of the same economic concerns and cut-backs by the Defendant and no similar action was taken or considered, while Stephanie Wright testified that the Defendant's office manager specifically warned her not to tell Bryant about Plaintiff's suicide attempt or he would fire him. See <u>Stephanie Wright Deposition</u>, p. 36; <u>Plaintiff's Deposition</u>, p. 33.

      This evidence is sufficient to create an inference that the Defendant failed to restore Plaintiff to his position or an equivalent position as required by the FMLA sufficient to survive summary judgment. *Cf.* <u>Reeves</u>, 530 U.S. at 140-143 [setting forth the general proposition that where a plaintiff presents sufficient evidence to raise an inference that the employer's asserted justification



for the employment decision is false, a trier of fact can conclude that the employer unlawfully discriminated.]. While the Defendant has provided evidence to dispute this claim, considering the evidence in the light most favorable to the Plaintiff, as this Court is required to do at summary judgment, the undersigned does not find that "[n]o reasonable trier of fact could conclude" that a violation of the FMLA occurred when the Defendant terminated Plaintiff's employment (and/or eliminated his position). Spratley v. Hampton City Fire Dept., 933 F.Supp. 535, 542 (E.D.Va. 1996), aff'd, 125 F.3d 848 (4th Cir. 1997); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)[At summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor . . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," are all functions for the trier of fact]; Muhhammad v. Klotz, 36 F.Supp.2d 240, 243 (E.D. Pa. 1999); Reeves, 530 U.S. at 140-143. Therefore, the Defendant is not entitled to summary judgment on this claim.

## IV.

### (After-Acquired Evidence)

Finally, Defendant argues that this case should be dismissed because of after-acquired evidence that Plaintiff used marijuana, and that he therefore would have been terminated by the Defendant anyway for that reason alone. See Cox v. Handcrafted Homes, LLC, No. 09-2811, 2010 WL 2079724 (D.S.C. May 24, 2010)[noting that the "evidence must be such that had the employer known of it before the discharge, the employer would have fired the employee on those grounds alone anyway"] The evidence reflects that the Defendant's policy as set forth in its handbook states,

> While on Stark Truss Company, Inc.'s premises, or while operating or riding in or on a Company vehicle and while conducting business-related activities of Stark Truss Company, Inc.'s premises, no employee may use, possess, purchase, distribute, sell,



or be under the influence of alcohol or illegal controlled substances.

The Defendant's policy also sets forth conditions of drug testing (including random drug testing). <u>See</u> Defendant's Exhibit 2 [Handbook], p. 2-2.

Plaintiff testified that he was not sure if he ever used marijuana after he was employed by the Defendant, but if he did, it would have been eleven or twelve years ago. <u>See</u> <u>Plaintiff's Deposition</u>, pp. 115-116. Plaintiff also testified that he does not use marijuana recreationally and had not used it in June 2009. <u>See</u> <u>Plaintiff's Deposition</u>, pp. 96-97. When Plaintiff was questioned in his deposition why his medical records had "cannabis" written on them, Plaintiff said that he told his physicians that he had used marijuana before, but that that would have been eleven or twelve years earlier, although after additional questioning Plaintiff did testify that it was "possible" that he may also have used marijuana once in 2007 or 2008. <u>See</u> <u>Plaintiff's Deposition</u>, pp. 114-116.

However, there is no evidence that Plaintiff ever used marijuana on the Defendant's premises, while operating or riding in a company vehicle, or while conducting the Defendant's business. <u>See</u> <u>Plaintiff's Deposition</u>, pp. 96-97, 114-116. Plaintiff also testified that he was drug tested by the Defendant per its policy, that he never cheated on a test, and that he never tested positive for drug use. <u>See</u> <u>Plaintiff's Deposition</u>, p. 116. Considered in the light most favorable to the Plaintiff, the undersigned does not find that this evidence shows that Plaintiff violated Defendant's policy regarding drugs and would have been terminated on that basis so as to entitle the Defendant to summary judgment on this ground.



## Conclusion

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment be **denied**.

The parties are referred to the notice page attached hereto.



_____
Bristow Marchant
United States Magistrate Judge

May 10, 2012
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a *Defendants' Exhibit* novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk

United States District Court

P.O. Box 835

Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

